Appeal by Herman Ensor, M.D., and Ensor, Baccus 
Williamson, P.A., from a judgment for plaintiff, Misty Wilson, a minor suing by her next friend, based upon a jury verdict that awarded plaintiff $2.5 million. *Page 1246 
The action was based upon allegations of malpractice.
Plaintiff is a child who was born prematurely, suffering a degree of brain damage and retardation. Prior to her pregnancy with Misty, Mrs. Wilson had experienced two miscarriages and one abortion. Mrs. Wilson's condition, described as bicornate uterus, increased the risk of miscarriage or pre-term delivery, and, in fact, she had been medically advised not to risk a premature baby or another miscarriage by another pregnancy. Nevertheless, she did become pregnant again, and, for the first 19 weeks of her pregnancy, was a patient of Dr. Ben Younger in Birmingham.
On October 24, 1979, Mrs. Wilson was seen for the first time by Dr. Howard Williamson, a partner in the professional association of Ensor, Baccus Williamson. Dr. Ensor had examined her earlier to administer a pregnancy test.
Around 10:00 p.m. on December 29, 1979, thinking her "bag of waters had broken," Mrs. Wilson telephoned Dr. Williamson's answering service and was told that Dr. Ensor was on call. Within a few minutes, Dr. Ensor returned the call. Mrs. Wilson told Dr. Ensor that her "waters had broken," that her due date was the end of March, and that she had been taking medication, but had developed a rash, whereupon earlier in the week Dr. Williamson had advised her to stop that medication, substituting Vasodilan. According to Mrs. Wilson, she explained why she knew her waters had broken and, in response to Dr. Ensor's question, told him that she could be at the Cullman hospital in about 20 minutes. She testified that Dr. Ensor stated that he could meet her there in ten minutes.
Dr. Ensor denied that he told Mrs. Wilson that he would meet her at the hospital. In any case, a nurse at the Cullman hospital, Sandy Alldredge, was telephoned by Dr. Ensor and given orders to admit Mrs. Wilson to a room; to check her with nitrozine paper, but not to give her a pelvic examination; to do a complete blood count and urinalysis; to administer Dalmane by mouth; and to confine her to bedrest with bathroom privileges. As Dr. Ensor explained: he did not wish a pelvic examination, which might stimulate labor; a nitrozine test would determine membrane rupture; and if that had happened, he wanted Mrs. Wilson sent to the University of Alabama at Birmingham Hospital ("U.A.B.") immediately. Such a rupture at 29 weeks is a medical emergency, since labor may soon follow with delivery of a premature baby, Dr. Ensor explained, or there is a risk of infection to the baby. He stated that he had no intention of keeping Mrs. Wilson in Cullman because the Cullman Medical Center did not have facilities to care for such a premature child.
Mrs. Wilson proceeded to the Cullman hospital, where she was taken to a room at 10:50 p.m., undressed, and put to bed. By 11:00 or 11:05, the attending nurses ascertained that her waters had in fact ruptured. The attending nurse who made this determination did not telephone the results to Dr. Ensor. According to her, absent specific instructions from the doctor to call, the proper procedure was that the nurse was to use her judgment as to whether to call him, and thus the attending nurse proceeded to use a fetoscope to locate the baby's heartbeat. A fetal heart monitor was then attached to Mrs. Wilson. The graph ran for 26 minutes and was removed at 12:05 a.m. A factual dispute over its reading exists: the nurses testified that the monitor strip revealed late decelerations of the fetal heart rate and, thus, fetal distress; the testifying physicians all concluded that the strip did not conclusively disclose late decelerations. Dr. Ensor himself denied that it disclosed any late decelerations.
Having determined that the waters had ruptured and that Mrs. Wilson was experiencing irregular contractions, and, according to the nurses, having observed late decelerations of the fetal heart rate, one of the attending nurses telephoned Dr. Ensor to report Mrs. Wilson's condition. The medical records disclose that he was called at 11:35 p.m. The tape itself contained a written time notation indicating that Mrs. Wilson was taken off the tape at 12:05 p.m. *Page 1247 
Based upon the nurses' testimony and the length of the graph, 26 minutes, it is possible that the tape reading did not begin until 11:39 p.m. Nurse Alldredge testified that the attending nurses would have watched the strip for 19 or 20 minutes before they could have made a judgment on its disclosures.
According to Dr. Ensor, he was told by the nurse who telephoned him that the nitrazine test was positive and that Mrs. Wilson had begun to have some contractions, but he stated that he was not told that there had been decelerations and fetal distress. On the other hand, nurse Bonnye Cruce testified of telling Dr. Ensor by telephone of the late decelerations on the monitor strip. During this conversation, Dr. Ensor ordered Mrs. Wilson transferred to U.A.B., and she was placed in the ambulance for transfer at 12:05 a.m., or a short time thereafter.
Dr. Ensor gave no special instructions regarding Mrs. Wilson's trip in the ambulance because, as he testified, under what he knew about her and had been told, no special orders were needed. He stated that, as far as he knew, both Mrs. Wilson and the baby were in fine shape when they left the hospital. Dr. Ensor did not telephone U.A.B. to advise of her departure, stating that U.A.B. had a policy of accepting any patient transferred to it, and that there were always staff physicians and two or three residents available in the labor and delivery unit. His procedure in this instance, he related, accorded with the practice at Cullman and with transfer procedures he had discussed with the acting director of maternal medicine at U.A.B. On the other hand, there was evidence admitted on the "Standards for Obstetric and Gynecologic Services," which required that the transfer of patient care be preceded by a complete explanation of the need for the transfer, and that the transfer be acceptable to the other facility. Dr. David Abramson, plaintiff's expert witness, interpreted this to mean: "The doctor, the responsible doctor, has to call the other doctor on the other end and say, I am sending you such and such a patient, and that doctor has to agree to accept that patient and then and only then can you transfer the patient."
When Mrs. Wilson departed Cullman at, or near, 12:05 on the morning of December 30, 1979, the baby was healthy and had incurred no brain damage. Dr. Abramson, though not certain, testified that the fetal monitor strip might disclose late decelerations indicative of the baby's reaction to contractions of the uterus, resulting in loss of circulation in the baby and a drop in the baby's heart rate. This, to him, represented a potential problem. Other physicians differed. Nurse Alldredge accompanied Mrs. Wilson in the ambulance to U.A.B., and, according to her, Mrs. Wilson did not require either oxygen or intravenous fluids during the trip. When the ambulance was near Gardendale, about ten minutes from U.A.B., Mrs. Wilson's contractions became harder. Dr. Abramson's testimony indicated this event as the time when the baby, Misty, could have suffered brain damage from a lack of oxygen.
Nurse Alldredge testified that the ambulance driver radioed ahead to U.A.B., but stated that when they arrived shortly after 1:00 a.m., no one was expecting them, but that Dr. C.J. Searcy was there when she went in. Dr. Searcy met them in the hallway in front of the entrance to the labor and delivery room. Dr. John Huddleston, another physician on duty, also participated in the evaluation, which indicated that Mrs. Wilson would soon deliver a premature child. Mrs. Wilson was taken into the delivery room, where a fetal monitor was applied at approximately 1:10 a.m. This provided an unsatisfactory reading, so an internal fetal scalp electrode was applied. The record executed by Dr. Searcy showed fetal distress. Dr. Searcy testified that the strip tracing from this monitor disclosed some variable deceleration and was compatible with a very late stage of labor and imminent delivery, not unusual. On the other hand, Dr. Abramson testified that this strip was indicative of fetal distress, and Dr. L. Jeffers Fowlkes, defendant's expert witness, testified that the strip disclosed severe variable decelerations, very common at that time in labor. Dr. Fowlkes *Page 1248 
added that unalleviated severe variable decelerations can lead to hypoxia (low oxygen) or asphyxia (metabolic abnormality), and that unalleviated asphyxia can lead to brain damage.
Mrs. Wilson was taken to the delivery room at 1:20 a.m. The baby descended three stations in five minutes, and, according to Dr. Searcy, the infant was delivering so rapidly there was no time to perform an episiotomy. According to Dr. Searcy, this situation offered no indications for an episiotomy because the perineum offered no resistance to the fetal head, which was delivering quite rapidly. He added that, under other appropriate circumstances with time to safely do so, in his opinion an episiotomy would have been performed. The baby was born at 1:25 a.m., or approximately 22 minutes after Mrs. Wilson arrived at U.A.B. The total process from rupture of membranes to delivery encompassed approximately three hours. When born, Misty was eleven weeks premature and weighed 2.5 pounds.
According to Dr. Huddleston, the baby was born in excellent shape, but prematurely; it could not have been in any better shape with its premature state. An Apgar test (a system measuring the condition of a newborn baby) was made within one minute after birth, with a score of "2" (a low score). In the opinion of Dr. Abramson, this indicated that the child was born near death. Dr. Huddleston, however, testified that Apgar scores are low on premature babies because these babies do not have the neuromuscular development necessary to perform the acts included in the scoring system. The baby was described by Dr. Huddleston as a rigorous baby five minutes after birth. Dr. Huddleston also referred to studies which "found a large percentage of babies at this age range who had quite normal cord artery pH, which is the measure of acid related to hypoxia in the Apgar score. The Apgar score was zero to three and a lot of them still had quite normal cord artery pH's . . . [m]eaning that they [were] normal prematures who were not asphyxiated and you would not be able to say that the low Apgar score meant asphyxia." On the other hand, the entry, "Asphyxia — Apgar 2," appears under a discharge sheet executed by a pediatrician at U.A.B.
Immediately after birth, a blood sample was taken from the baby's umbilical cord. The cord blood gases, according to Dr. Searcy, were normal. The baby's bicarbonate level of 23 was normal and indicated to Dr. Huddleston that the baby had not suffered a serious hypoxic episode within 30 minutes to one hour prior to delivery. Dr. Searcy testified that, judging from the levels of blood gases, his opinion was that there was no evidence that the baby suffered from any asphyxial problem 30 minutes before:
 "[B]ased on the bicarbonate which is totally normal, had this child been asphyxiated and acidotic it would have been reflected in that bicarbonate and it would take a while for it to get back to normal should all that stress have been relieved and everything normalized, it would take a while for the body to show that in the blood."
The cord gas test was described as the "gold standard" in determining whether or not the baby was asphyxiated at the time of delivery. However, Dr. Abramson testified that from what was known about this baby, he would expect her blood gases to be normal: "If the injury were completely due to the trauma, then the blood gases could be normal. The blood gases would be abnormal if the injury would be due in part at least to asphyxia." According to Dr. Searcy, there was no medical evidence that Misty suffered hypoxia before arriving at U.A.B. Another attending physician, Dr. Morawitz, found no evidence of intraventricular bleeding at the time of Misty's delivery. On the other hand, Misty's medical records at the hospital stated: "Suffered a subarachnoid hemorrhage at birth and had multiple problems in the high risk NICU." And the medical records describing the "history of present illness" listed "apnea and bradycardia early in the course which was secondary to intracranial hemorrhage."
There was testimony that Misty faced numerous medical problems because of her severe prematurity and low birth weight. *Page 1249 
It was also established that as many as 35% of preterm babies in Misty's weight range die, and that approximately 30% of surviving babies born at less than 30 weeks' gestation have some gross neurological abnormalities. But other evidence established that for premature babies in Misty's weight range, the survival rate was 74% with no higher incidence of cerebral palsy and mental retardation than the group of matched controls.
The evidence disclosed that most preterm babies in Misty's weight range suffer from hyaline membrane disease ("HMD"), also known as respiratory distress syndrome. According to the evidence, HMD, a disease occurring when the lungs are not yet ready to breath, is the number one problem causing death in premature babies. Fetal lungs, it was shown, make a substance known as surfactant, which is necessary to keep the lungs expanding when one breathes. Pre-term babies breathe; however, their lungs will not expand without surfactant, and, as a result, they develop HMD. There was testimony that in its natural course, HMD becomes worse over the first few days of such a baby's life, and, as it worsens, asphyxia and acidosis result if there has been oxygen deficiency for a period of time. And it is not uncommon for such an infant's lung to collapse due to the problems associated with the required mechanical respiratory therapy necessary to get oxygen into the lungs.
On the other hand, there was medical testimony that these problems did not cause any brain damage to the baby, and specifically, that Misty did not suffer any hypoxic eventfollowing birth that would have led her to have any brain damage.
On the second day of her life, December 31, 1979, and as a result of HMD, Misty continued to experience respiratory problems. Her chart was marked "watch for ICH [intracranial hemorrhage]," and she was placed on a ventilator. Then, on January 1, 1980, at approximately 4:00 a.m., one of her lungs collapsed, and there was testimony that this was the most significant hypoxic event she sustained. The next day, her spinal fluid pressure was tested and found to be rising, indicating that hemorrhage had occurred. The intracranial spinal fluid pressure increased from 18 centimeters of water on January 2 to 35 centimeters of water on January 3. This change in pressure indicated a massive intracranial hemorrhage.
According to the medical testimony, the classic setting for an intracranial hemorrhage is a premature infant who has sustained a significant hypoxic event 24 to 48 hours prior to the hemorrhage. Misty's brain hemorrhage was diagnosed five days after her birth, yet the medical records disclosed symptoms of hemorrhage occurring within 24 to 48 hours from the time of the hardening of Mrs. Wilson's contractions at or near Gardendale. There was also testimony that an intracranial hemorrhage is frequently caused by the immaturity of lungs and inability to provide adequate oxygen, and this respiratory failure due to HMD generally, places great stress on the cardiovascular system, i.e., it can provoke changes in blood pressure and blood chemistries that can lead to hemorrhage in these areas of a poorly developed premature brain.
On January 3, 1980, a pediatric neurologist diagnosed a massive intracranial hemorrhage in Misty with a poor prognosis for survival. A CAT scan performed on January 16 disclosed a type-four subependymal/intra-ventricular hemorrhage. A neurosurgeon, who later operated on Misty, testified that there was no way that Misty could have sustained a hemorrhage of this magnitude a day or two after birth and the symptoms of it not be manifested until later. Even so, Misty's neurosurgical medical records stated: "Suffered a subarachnoid hemorrhage at birth and had multiple problems in the high risk NICU."
The brain hemorrhage caused Misty to develop hydrocephalus because the blood blocked the pathways through which spinal fluid is normally reabsorbed, causing her head to "balloon up." Temporary measures were used to drain the spinal fluid from Misty's brain until surgery could be performed. Later, in March 1980, when she had gained sufficient weight, an operation *Page 1250 
was performed on Misty; a shunt, i.e., a surgically created channel, was placed in her brain to drain off spinal fluid.
As a result of the massive brain hemorrhage, a substantial amount of brain tissue was destroyed, primarily on the right side of Misty's brain. She suffers from cerebral palsy, affecting the left side of her body, and mental retardation.
Misty filed this action in December 1981 by her next friend and natural father, Robert Wilson, naming as defendants, among others, Dr. Herman C. Ensor, and Ensor, Baccus 
Williamson, P.A. The complaint alleged that the defendants provided negligent medical and obstetrical care to Misty prior and during her birth which resulted in her injuries. Pleadings, motions, and discovery ensued. Trial was had for some 18 days, after which a jury verdict was rendered awarding damages against the defendants named above in the amount of $2.5 million. The defendants moved for a new trial, or judgment notwithstanding the verdict, upon a number of grounds. After a hearing, the trial court denied the motion, and the defendants appealed. We will consider the issues raised in sequence.
 I.
Did the trial court err in its refusal to grant defendants' motions for a directed verdict, JNOV, or new trial?
Central to defendants' argument of this issue is their insistence upon an absence of proximate cause. In short, defendants argue that there was no evidence establishing a connection between any conduct of Dr. Ensor and the injuries sustained by plaintiff. And, in that connection, defendants attack the propriety of allowing plaintiffs' expert medical witness to testify that Dr. Ensor's care fell below the standard of care required of obstetricians.
The generally accepted principle of proximate cause was explained in Marshall County v. Uptain, 409 So.2d 423, 426
(Ala. 1981):
 " 'The proximate cause of an injury is the primary moving cause without which it would not have occurred, but which, in the natural and probable sequence of events, produces the injury.' City of Mobile v. Havard, 289 Ala. 532, 268 So.2d 805 (1972), appeal after remand, Havard v. Palmer Baker Engineers, Inc., 293 Ala. 301, 302 So.2d 228 (1974). Negligence need not be the sole cause of injury in order to hold the negligent person liable. It is sufficient that his or her negligence, 'concurring with one or more efficient causes, . . . is the proximate cause of the injury.' [Citations omitted.] When the concurring cause is another person's negligence which might reasonably be anticipated or foreseen, the original act of negligence may be regarded as the proximate cause of the injury which results. [Citations omitted.]"
See also Davison v. Mobile Infirmary, 456 So.2d 14 (Ala. 1984), and Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala. 1985), where it was stated that:
 "The rule in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury. Baker v. Chastain, 389 So.2d 932 (Ala. 1980). If there is a scintilla of evidence in a malpractice case that the negligence complained of probably caused the injury, a jury question is presented. Orange v. Shannon, 284 Ala. 202, 224 So.2d 236 (1969)."
This principle was recognized and applied in Howard v.Mitchell, 492 So.2d 1018 (Ala. 1986), and follows the pronouncement contained in Orange v. Shannon, 284 Ala. 202,206, 224 So.2d 236, 239 (1969):
 "The rule of our cases in malpractice suits is that there must be something more than a mere possibility — something more than one possibility among others — that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury. Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87 [1958]; McKinnon v. Polk, 219 Ala. 167, 121 So. 539 [1929]. But this does not eliminate Alabama's 'scintilla' *Page 1251 
rule. If there is a scintilla of evidence that the negligence complained of probably caused the injury, a jury question is presented. Pappa v. Bonner, supra, and cases there cited."
Given the law of proximate cause, did the trial court err in allowing Dr. Abramson to testify to facts bearing upon that issue?
This issue arose because Dr. Ensor was a specialist in obstetrics, while, as defendants argue, Dr. Abramson was a pediatrician, with a subspecialty in perinatal medicine. Thus, defendants insist, Dr. Abramson was not qualified to give a professional opinion on whether or not Dr. Ensor's actions fell below the standard of care for an obstetrician in his treatment in connection with Misty's birth and injuries.
The qualification of a medical expert in one discipline to testify in another was the subject of Wozny v. Godsil,474 So.2d 1078 (Ala. 1985). It will be helpful to consider this Court's observations in that decision, at 1080-81:
 "As a general rule, a physician of one school of medicine is incompetent to testify in a malpractice case against a physician of another school of medicine. This rule is stated at 61 Am.Jur.2d, Physicians and Surgeons, etc., § 353, p. 516 (1981):
 " 'Generally speaking, physicians of one school are regarded as incompetent to testify in malpractice actions against physicians of other schools, and it has been held that the defendant in a malpractice action is entitled to the testimony of competent practitioners of his own school of medicine as to the teachings of that school and his conformity thereto in his treatment of his patient, on the issue of whether he exercised the requisite degree of skill and care in such treatment.'
 "An exception to this general rule is recognized in this same paragraph from 61 Am.Jur.2d, supra:
 " 'This rule does not however, exclude the testimony of physicians of other schools or experts in other lines when that testimony bears on a point as to which the principles of the two schools concur, such as matters of diagnosis, the methods and dangers of the use of X-ray or other electric or mechanical appliances in common use by the several schools, or the existence of a condition that should be recognized by any physician of any school. There is authority, however, which emphasizes the point that the tenets and standards of treatment which form the premises for the testimony must be so substantially the same on the point in issue as to afford a true test. . . .' [Emphasis added in Wozny.]"
Dr. Abramson's extensive direct examination included the following testimony:
"Q. What field do you practice in your day to day activities?
"A. I have three specialties. I am a specialist in pediatric medicine and perinatal medicine, that means the period around birth, and in emergency medicine. I practice each day in all three of my specialties.
"Q. When you are talking perinatal medicine, can you explain to us where that fits in in terms of between obstetrics and taking care of the child and pediatrics?
"A. Sure. I think so anyway. Traditionally or a long time ago, there were two specialties that dealt with reproductive medicine and the process of having babies and taking care of them.
"One was obstetrics and gynecology. One was pediatrics. And usually the obstetrician/gynecologist [would] take care of the mother and fetus up until the time that the baby was born. And then, the pediatrician would come on and take care of the baby and the child as the baby grew up.
"And in the late 1950's, early 1960's, it became very clear that there was a long period of time, usually 40 weeks [or so] when the mother and fetus exist as a team, and that there are considerations for both of them. And some obstetricians/gynecologists and some pediatricians became interested in the area where there was a big overlap between the specialties. And there became subspecialists who were interested *Page 1252 
in dealing just with that period of time and with reproductive medicine.
"If you started like Doctor Huddleston started, as an obstetrician/gynecologist, so he took his sub-boards in what's called fetal and maternal health.
"I started as a pediatrician. So, I took my sub-boards in what's called newborn perinatal medicine. But, we share the interest in the mother and fetus during the time of pregnancy and the newborn.
"The field of medicine is called perinatal. It comes from peri, which means around, natal meaning birth. It means the period around birth. And it's defined usually as the period from the time that the baby could live if born up until the end of the baby's first month of life is defined as the perinatal period.
". . .
"A. . . . I then became the physician in charge of the nurseries of Georgetown. And then founded the division of newborn and perinatal medicine in the department of obstetrics and gynecology and pediatrics.
"I became part of the full-time faculty in pediatrics, and in obstetrics and gynecology at Georgetown and stayed there for the next eight years.
". . .
"Q. And during your fellowship period, did you do any special research projects?
"A. I had many research projects going. I think the most important one while I was a fellow was in the effects of what happened during labor and delivery on Hyaline Membrane Disease and on the blood coagulation system in the mother, and the fetal placenta circulation in the newborn.
"Q. The word has come up before already in this trial, Hyaline Membrane Disease. What is that, doctor?
"A. Hyaline Membrane Disease has a lot of different names. It's a disease that premature babies get. And it's not really a disease. It's just simply the fact that because babies are premature, sometimes they are born before their lungs have gotten all the chemicals that they need to make it easy to breathe. And those babies then will have difficulty in breathing after they are born and we call that Hyaline Membrane Disease or Respiratory Distress Syndrome is the preferred word for it.
". . .
"Q. You said you taught medical students. Were you actually teaching them obstetrics at that time?
"A. I was teaching in obstetrics, pediatrics and physiology. I taught in all three of their curriculums in reproductive medicine.
"Q. And part of your duties in administration, did you ever have any type of committees where they actually did review of the care that had been administered to patients?
"A. Yes, sir, both on the individual hospital level at Georgetown and several of our affiliated hospitals. And I also was chairman of the committee on the fetus and newborn for the three-state area in which we practiced, and reviewed the policies and procedures and what was done at each and every hospital within that three-state area.
"Q. And how many years were you working there under those duties?
"A. Seven years.
"Q. Seven years. During that period of time, did you take some time off, I believe that [they] call it a sabbatical, to write a book?
"A. I took my seventh year off, you know, at Georgetown and completed work on the book that I was on the senior editorial staff, called Prevention of Fetal, Embryologic and Neonatal Disorders.
"Q. And bringing that down into laymen's terms, what was the book about?
"A. The book was about what we knew about reproductive medicine and about what the risks were, how they could be dealt with, what we knew at that time, which was 1976 or 1977, and where we ought to be going; in other words, we started to talk about complete regionalization and that sort of thing in the book. *Page 1253 
"Q. Since '77, when you left Georgetown School of Medicine, have you been on full-time faculty anywhere?
"A. No, sir. I took a leave of absence from the Georgetown full-time faculty. I have not joined another full-time faculty.
"Q. Do you do any part-time teaching?
"A. I do a lot of part-time teaching.
"Q. Explain that for us.
"A. Well, certain commitments that are longstanding. I teach for the State of Maryland, for the Institute of Emergency Medical Services, problems in dealing with children, with reproductive emergencies, and with resuscitation or helping children who have been seriously injured. I do that, I believe, six times a year.
"And then, I am invited as visiting professor to different universities throughout the country and throughout the world, actually, to talk about any one of the fields that I teach in.
"Q. You said that while you were there at the Georgetown School of Medicine that you developed, and I wrote down what you said, it was something about the chairman of the division of newborn and perinatal medicine?
"Q. Yes.
"Q. What was that that you developed?"
"A. That was basically a new department that fell within — my office was in obstetrics and gynecology. But, my department was responsible both to obstetrics and gynecology and to pediatrics, and it dealt with high risk reproduction. In other words, the kind of case that Cathy was in here, Cathy Wilson was. This is a case where you expect problems. And in that kind of case, we would call it high risk, and that would fall under the jurisdiction of the high risk department, would be automatically consult to my department, the same as it would be at U.A.B. This is a very high risk delivery and the whole team then would get involved.
"Q. And in talking high risk deliveries, have you yourself delivered children in a high risk situation such as Cathy and Misty had?
"A. I have. I try not to, but certainly I have.
"Q. About how many babies have you had to deliver yourself?
"A. Several hundred.
"Q. How many high risk deliveries have you participated in as part of the team?
"A. Many thousand.
". . .
"Q. I understand one time that you were the chief of the committee of the three-state area that was examining the care for the fetus and the newborn?
"A. Yes, sir, that's correct.
"Q. What states were that? And then tell us a little bit about that.
"A. Well, it's not really three states. It's the District of Columbia, Maryland and Virginia, which forms — Maryland and Virginia completely surround the District, so that anything that happens involves three states. It's like going across the street, you might be in a different state, so it's all one area.
"I chaired the committee on the fetus and the newborn to examine the policies and procedures and quality of care at all the hospitals in terms of obstetrical care, labor and delivery care and the neonatal care, and to deal with the referral patterns during the period of time that regionalization was going on."
Under the principles approved in Wozny, supra, and the standard of care set out in Code of 1975, § 6-5-484,[1] this evidence sufficiently disclosed Dr. Abramson's background and familiarity with the school of *Page 1254 
obstetrics on the standard of treatment to be exercised by Mrs. Wilson's obstetrician at the time in question. Hence, it was not error for the trial court to allow Dr. Abramson's testimony as an expert in perinatal care.
Did the testimony of plaintiff's medical expert, Dr. Abramson, satisfy the requirements of the law for proof of negligence and proximate cause?
According to Dr. Abramson's testimony, Dr. Ensor departed from the proper standard of care of Mrs. Wilson and her fetus in a number of interrelated ways:
(a) Dr. Ensor did not go to the Cullman hospital to examine Mrs. Wilson to determine whether her cervix had changed, nor did he allow the hospital nurse to examine her. Thus, Dr. Ensor did not conduct, nor did he have conducted, the examination needed to determine whether Mrs. Wilson was in labor. Because the records at the Cullman hospital disclosed active labor, with ruptured membranes at 29 weeks, "that" Dr. Abramson said, "is a medical emergency of the highest magnitude." He added:
"Q. We see that she arrived at 10:50 p.m. And assume that at the time that she arrived at the hospital that Nurse Alldredge notified Doctor Ensor of the admission, and assume for the purposes — and here is where it says, physician notified of admission, Doctor Ensor by Nurse Alldredge. That's what it says there. Assume for the purpose of this question that she notifies him and at the time that she notifies him that she has the information of the nitrazine test showing that the membranes have, in fact, ruptured, and that in her opinion the patient is in active labor.
"Now, under that set of circumstances, do you have an opinion what the appropriate response would have been by Doctor Ensor to that information?
"A. Yes, sir.
"Q. Tell us about that.
"A. He then has to make a decision, is she far enough advanced in labor that they can no longer safely transport the mother and fetus to U.A.B., or is she not. So, what he has basically got to do is say, hopefully we will be able to transport mother and fetus to U.A.B. I am on my way in to find out and make arrangements for that, and let's go ahead and call them and let's get started on anything we need to do to accomplish that, and get a monitor on so we know what the status of the fetus is because that, too, is critically important in this situation. But at that point, you know that she is going to deliver, it's a question of when and what you need to do on the way, what you need to do either on the way down to U.A.B., or what you need to do in terms of getting — arranging for safe transport for the baby if she is going to deliver in Cullman. In this case, we know that she was in early labor, could easily and safely have been transported; that arrangement could have been made with Doctor Huddleston or Doctor Searcy, they would have been expecting her. She would have been transported in an appropriate position with fluids and oxygen and the outcome might then could have been very different.
". . .
"Q. I want you to assume that he hasn't come in, he hasn't done what you've felt is the appropriate response initially to come in and examine her. Now, let's just assume that that doesn't happen. Let's assume that in your opinion [the doctor] doesn't give the right orders. He won't let them do a pelvic exam, and he tells them to check to see if she is in labor.
"Let's assume that has occurred and you have told us that he should have done other things. Assuming that has occurred, he finally gets a call from the nurse after she determines about the late deceleration, even after all this other has occurred. At that point do you have an opinion what his response should have been under that circumstance?
"A. At that point the question is, do we or don't we have time to get her down to U.A.B.
". . .
"Q. How do you determine whether or not we would have time? *Page 1255 
"A. Examine her and find out how far progressed she is in labor, attempt to do everything you can for fetal resuscitation, and that simply means get the mother into an appropriate position where the weight of the baby isn't laying on the mother's big blood vessels and interfering. So, you need to get the mother over onto her side, breathe her on some oxygen, get intravenous fluid going, call U.A.B., talk to whoever is going [to be on the] highrisk obstetrics that night, and tell them where she is, what condition she is in and that you are transporting her immediately down so that they can be ready for her when she walks in the door and that's it if you determine from your examination that you have time to do that. If you don't, you may try and get someone up that can take care of the baby. In this case, we know there was time. So, that's what we would have done.
"Q. And there are no such orders as you've described in the records, is there?
"A. None at all, no, sir.
"[His testimony continued, on cross examination:]
"Q. . . . Now, I want to come to my last point, it's your testimony and you are telling the jury that Misty has brain damage and that this brain damage was caused by two things, that's asphyxia of the fetus before birth, is that right or wrong?
"A. That's only one, sir.
"Q. All right. That combined with trauma during birth, going through the birth canal?
"A. I don't believe it was going through the birth canal. I think it was just coming out through the perineum.
"Q. Coming out the perineum?
"Q. Yes, sir.
"Q. I want to be sure about this. You are saying that her brain injury was caused by two things; one, asphyxia before birth. In other words, not — the little fetus, the little baby inside the mother is not getting enough oxygen in the brain?
"A. Yes, sir.
"Q. Combined with trauma to the head when the head comes out the end of the birth canal?
"A. Yes, sir.
". . .
"Q. There was certainly no asphyxia in your opinion when she left Cullman Medical Center, was there?
"A. Well, I think that there was probably signs that you were getting asphyxia, yes, sir.
"Q. I thought you just told us the brain was entirely intact and normal?
"A. I said if the baby had been delivered appropriately, it would have been, there was no permanent brain damage. But, there were late decelerations going on according to the nurses, according to, as you say, your nurses who were standing there with the mother and making their assessment, they assessed a progress of labor that would indicate that hypoxia was playing a part in it. My testimony is from the chart that I have seen, that had the baby been delivered approximately, at an appropriate time, that the baby had not already been permanently injured at that time and that standard care would have wound you up with a good baby that would have done well. But that didn't happen.
". . .
"Q. Remember when I examined you I said I wouldn't waste time and I would call your attention to this.
"Here is question, what is the basis of your opinion that had she been transferred 30 minutes sooner, that this would not have happened, that her problems would not have occurred. What was your answer?
"A. Had she been transferred in a standard fashion 30 minutes sooner, all of her problems were easy to deal with.
"Q. That's your answer today, too?
"A. Yes, sir, certainly.
"Q. And in other words, what they did with all of this fooling around and with — whoever did it, the doctor or the nurses or whoever did it, they were 30 minutes off?
"A. Thirty minutes, I believe would have made a big difference. But, not only *Page 1256 
30 minutes. And transferred in standard manner, that means that Doctor Searcy and Doctor Huddleston knew what was coming.
"Q. Should have been given the orders and the — we will let them testify. But, what I am trying to say, had she been transferred in a standard fashion —
"A. Yes, sir.
"Q. — 30 minutes sooner, all of her problems were easy to deal with?
"A. That is correct, if she had been sent to them in a standard fashion but earlier.
"Q. Something then happened in that ambulance, because she left Cullman just like you told Bob, with no asphyxia?
"A. No, sir. I didn't tell him that. I said, it's my opinion that when she left there, no permanent brain damage had taken place, she was laboring with a preterm baby and the nurse was hearing late decelerations. And when she got to U.A.B., she has got severe variables and they can cause a problem and transferred her on, monitored her appropriately like they do at U.A.B., they would have gotten her to a safe delivery I think and she would have been fine.
"Q. Please, sir, you didn't tell Bob that there wasn't any brain damage when she left Cullman?
"A. Yes, sir. There was no permanent brain damage that had occurred yet. But, she was in the process of premature labor which can damage the brain unless you take appropriate care of it and appropriate care wasn't taken.
"Q. What wasn't taken?
"A. Appropriate care.
"Q. What was the appropriate care in that ambulance?
"A. However Doctor Huddleston had told Doctor Ensor that he wanted this baby transferred, much earlier and with appropriate monitoring and appropriate positioning of the mother I think this wouldn't have happened [sic].
". . .
"Q. Do you know what was not done in that ambulance?
"A. Yes, sir, of course.
"Q. What was not done that contributed to cause this young lady's brain damage?
"A. She wasn't put in soon enough. She wasn't in the right position. The doctor didn't know she was coming. She didn't have IV fluids going, and with the presence of late decelerations that the nurses heard, she wasn't breathing oxygen during transport. All of the things must be done to the standard. But, that's only one of the right ways to do it. As long as Doctor Huddleston had dictated how it was that she was to be transferred, it would have met the standard.
"Q. I will think that you will answer this, please, sir. You don't know what was done in that ambulance; do you?
"A. I know a lot of what wasn't done, but I don't know what was done.
"Q. All right. What wasn't done, then?
"A. She wasn't given oxygen, she wasn't on IV's, she wasn't standardly positioned, no doctor knew that she was coming and the nurse in charge during that transport didn't know who she was taking the patient to, and the guy who was getting this patient, these two [doctors] didn't have any idea in the world that a woman just about to deliver with a premature baby at 29 weeks was about to walk in the door unannounced as Doctor Searcy wrote in his note."
We have set out Dr. Abramson's and other evidence extensively, not only because of the nature of the case but also because of the insistence of defendants in their position regarding the element of proximate cause.
Although Dr. Abramson's conclusions were disputed by other medical testimony, under the authorities the evidence was not only sufficient to establish a factual issue on the breach of a professional duty but also to present a factual issue for the jury on the proximate cause of Misty's injuries.
 II.
Did the trial court err in permitting an in-court demonstration between Misty *Page 1257 
and a special education therapist? We quote from defendants' brief for an understanding of this issue:
 "Over the numerous and vigorous objections of defendant's counsel . . ., the court permitted a demonstration of Misty's physical and mental abilities and limitations to be conducted by Ms. Holland, a special education therapist, in the presence of the jury. During the course of that demonstration, Misty cried out, laughed, and called for her mother. . . . Ms. Holland repeatedly admonished her not to fall over as she walked and moved about on the mat which Ms. Holland admitted was not stable for walking on by anyone. . . . Presenting an adorable six-year-old child to the jury in this manner served no useful purpose other than to win the sympathy of the jurors for Misty and to substantially prejudice the defendants. Further, Ms. Holland testified on cross-examination that the demonstration was not necessary to explain Misty's physical and mental limitations to the jury — only that it would make it 'easier' or more 'graphic.' . . .
 "As noted in the objections raised prior and subsequent to the demonstration . . ., the exhibition of Misty in this fashion put the defendants at an unwarranted and unjust disadvantage. There was no opportunity during the demonstration to cross-examine Misty, she was not placed under oath, she was not competent to testify, and there were no adequate means for preserving for appeal purposes the effect of such a demonstration upon the jury. Indeed, to fully comprehend the impact of this demonstration upon the jury and all present in the courtroom, one had to have been there. All of these reasons justify the reversal of this case." (Emphasis added.)
In considering this issue, we note that the therapist, Dr. Francine Holland, the holder of a Ph.D. in education, was sworn as a witness and was subjected to a searching cross-examination. The trial court, moreover, required her examination to be previewed outside the jury's presence. It is clear, also, that the plaintiff's cognitive, as well as physical, ability was in issue on the matter of damages.
In his order denying the defendants' post-trial motions, the trial court made the following observations:
 "The defendants also contend that the in-court demonstration of the child by plaintiff's expert, Dr. Holland, was highly prejudicial and inflammatory. Undersigned Judge observed the witnesses and the child on a preliminary run-thorough outside the presence of the jury and again observed all concerned when the jury was present. In the court's view the demonstration fully comported with due process and modern standard personal injury lawsuit procedure. The minor plaintiff sat with her parents in the courtroom during an all-day voir dire, in the full presence of the jury, with no objection of any kind from the defendants' attorneys. In the court's opinion, the child appeared more animated in the Dr. Holland demonstration than she did while simply lying, almost comatose, with the parents during the voir dire."
The exhibition of injuries, usually by photograph or like means, see Occidental Life Ins. Co. of California v. Nichols,266 Ala. 521, 97 So.2d 879 (1957); C. Gamble, McElroy's AlabamaEvidence, § 207.01(5) at 461-2 (3d ed. 1977), is permissible in the measurable discretion of the trial court. While we have been unable to find a case directly on point, an Ohio case,Heidbreder v. Northhampton Township Trustees, 64 Ohio App.2d 95, 411 N.E.2d 825, 829 (1979), approved the demonstration in open court of an infant who allegedly had suffered brain damage:
 "The infant, Jonathan Heidbreder, remained outside the courtroom during the entire trial except for the period of demonstration. He was brought before the jury to demonstrate the extent of his motor paralysis and ability to communicate and to do simple tasks. This evidence was relevant to the issue of damages and peripherally so to the liability issue. Prior to this demonstration, an in-camera hearing was held and the proposed demonstration enacted for the trial *Page 1258 
court. The trial court specifically found that the evidentiary value of the appearance would not be outweighed by its prejudicial effect. We find no error in permitting the jury to see the demonstration and view the infant. . . ." (Emphasis added.)
It is not clear from Heidbreder that the demonstration held in that case contained questions and answers between the demonstrator and the demonstratee, or that, as here, the demonstration was conducted by a testifying witness or by counsel. Nevertheless, under the control of the trial judge, the demonstration in the present case was not different in theory and practice from the relevant exhibition of wounds, movement, articulation, and the like, whether by the witness himself or through the use of the medium of photography, which, after all, is in effect another witness. Indeed, it would be difficult to exhibit cognition without a demonstration of vocal expression, physical response, or a combination of both, and thus it would not be, as a matter of law, erroneous to have such a demonstration guided by a witness skilled in ascertaining such relevant responses and explaining their meaning. The accuracy of such a demonstration, of course, is to be tested by the requirements of relevancy, and such a demonstration is to be disallowed when its probative worth is exceeded by its capacity for prejudice. In this case, we find no abuse in the trial court's permitting the demonstration.
 III.
Did the trial court correctly prevent Dr. Fowlkes from testifying concerning care and treatment received by Misty Wilson at U.A.B.?
During the initial stages of this action, plaintiff addressed interrogatories to the defendants concerning expert witness testimony to be given on behalf of Dr. Ensor. In response to this inquiry, Dr. Ensor's lawyer responded that Dr. L. Jeffers Fowlkes (a member of an obstetrics/gynecology medical group practicing at St. Vincent's Hospital) would give his opinion concerning the prenatal care given during the period of time up until the transfer of Cathy Wilson, Misty's mother, to U.A.B. Furthermore, at the deposition of Dr. Fowlkes, the following occurred between Dr. Fowlkes and plaintiff's lawyer:
 "Q. And I see in the Rule 26 information that was given to me by Mr. Bushnell that says Dr. Fowlkes will give his opinions regarding the period of time covering the prenatal care through the transfer of Cathy Wilson to University Hospital, and that's correct?
"A. I suppose.
"Q. That's what you're here today for?
"A. Okay.
"Q. Is that your understanding?
"A. Yeah.
 "Q. So you do not intend to offer any opinions concerning the care and treatment the mother and/or infant received at University Hospital, would that be true?
 "A. I suppose. I'm just here to answer the best I can.
 "Q. But you have not formed — you said you even just looked over the records superficially. You haven't formed any opinions concerning the standard of care of whether or not the physicians met the proper standard of care in their treatment at University Hospital?
"A. Right.
 "Q. And then would it be true that you don't intend to give any opinions concerning the treatment that was given to the mother or infant at University Hospital either today or at the trial of this case?
"A. That's my understanding."
Furthermore, following the deposition of Dr. Fowlkes, plaintiff filed a motion in limine to prevent "any opinion of Dr. Fowlkes concerning whether any actions of Drs. Searcy and Huddleston met the proper standard of care." The effect of this motion was taken up in the preliminary discussions held in open court when the case was called for trial. The following discussion took place between counsel and the court: *Page 1259 
 "THE COURT: Anything, Mr. Worel to come up that would affect the voir dire?
 "MR. WOREL: Judge, the only thing that might could affect it, is I am moving — Jim Bushnell, if you remember, we had that motion in your office about where he wanted to substitute Doctor Fowlkes for Doctor Barnett as an expert witness. He has since let us know that he might call Doctor Barnett as well, as an expert witness. And I would move to preclude that, especially in light of our lengthy discussion in your office on the motion hearing when you allowed him to substitute Doctor Fowlkes for Barnett.
". . .
 "THE COURT: Did we have a pretrial hearing? We had a lot of letters.
 "MR. WOREL: Yes, sir. Do you remember at the time of the substitution of Doctor Fowlkes, they were already past the pretrial cutoff for even naming experts when they turned around and substituted.
 "MR. ALLEN: I'm not going to use him as an expert, Your Honor.
"THE COURT: What?
 "MR. ALLEN: We are not going to use him as an expert.
". . .
 "MR. ALLEN: If it please the Court, on that, I do not know. All Jim Bushnell and I are going to do is put Doctor Fowlkes on to prove that Doctor Ensor did everything just right. And we are not going to put him on to prove anybody else did anything wrong or right."
The trial court granted the motion in limine and limited the testimony of Dr. Fowlkes.
Thereafter, during the trial, Dr. Fowlkes was called as a witness by defendant, Dr. Ensor. His testimony on direct examination dealt primarily with the events in Cullman, including Dr. Fowlkes's opinion regarding the content of the fetal monitoring tape taken at the Cullman hospital. And then the following transpired between defendant Ensor's counsel and his witness, Dr. Fowlkes:
 "Q. All right, sir. Then the jury can hear that and weigh what you give. All right. Have you ever seen this (indicating)?
"A. No, sir.
 "Q. All right. This was taken as a hospital record [at U.A.B.], nursery flow chart, Misty Wilson?
"A. Yes, sir.
"Q. Are you familiar with that type of thing?
"A. Yes, sir.
 "Q. And what Doctor Huddleston has done is just put the pH out there?
"A. Yes, sir.
 "Q. Now, first, I want to ask you, do you agree that a normal pH as Doctor Huddleston has put up here, would be 7.23 — in between 7.23 and 7.33?
"A. Yes, sir.
 "Q. Well, you will note that on 12-30 everything was all right down to 8:10 and then there was a slight variance. And then it began getting — well, from there on, it began getting worse and worse. Are you familiar with that?
 "A. I see some pH's before that one that is circled that are lower than you would want to see that aren't really normal. I see a 7.04, a little bit above there, at 4:30 p.m.
"Q. And a 7.19, 7.04. You see those; don't you?
"A. Yes, sir.
 "Q. They show a gradual depreciation; doesn't it?
 "A. They are certainly worse there than they were the first two or three.
 "Q. Are you familiar with a disease called Hyaline Membrane Disease?
"A. Yes, sir.
"Q. Tell the jury what it is?
 "A. It's a disease that occurs when the lungs are not ready to breathe. Fetal lungs make a substance called surfactant that is necessary to keep the lungs expanded when you take a deep breath. So babies can breathe but their lungs won't expand without this surfactant material. So until an infant makes surfactant, they will develop a condition called Hyaline Membrane Disease that results from that. *Page 1260 
"Q. What causes that?
 "A. Prematurity, just a certain stage in gestation you have to reach to make surfactant.
"Q. When does it generally manifest itself?
 "A. Most babies will make surfactant by the time they are 35 weeks, although we see some that go a little longer.
 "Q. This child was 29 weeks. And then assume that these gas things are all right. You think the immediate ones were in your judgment. Assume that they were. It looks like Hyaline — like the symptoms of Hyaline Membrane Disease didn't appear until maybe a day or two later. Is that unusual?
 "A. I really couldn't make that assessment just based on seeing those blood gases.
"Q. Could not do that?
"A. No, sir.
"Q. You don't have that experience?
 "A. Well, I don't think anybody could just look at those blood gases and say whether or not that was [a] Hyaline Membrane baby. You need other pieces of information.
"MR. ALLEN: That's all I have."
This exchange obviously dealt with the contents of a chart on Misty Wilson's condition prepared at U.A.B., containing notations of Dr. Huddleston made thereon. No objections were made to these questions and answers, and, indeed, it does not appear that they were addressed to the subject of the motion in limine, i.e., opinions of Dr. Fowlkes on the standard of care exercised by the physicians at U.A.B.
The counsel for plaintiff took Dr. Fowlkes upon cross-examination:
 "Q. (By Mr. Emond) First, Dr. Fowlkes, I had not anticipated you testifying about anything over at the University Hospital, but let me just ask you, under this chart, you would agree that apnea and bradycardia caused a lack of oxygen, would you not, to the brain?
"A. Apnea and persistent bradycardia —
"Q. Yeah.
"A. — can cause that, yes, sir.
"Q. And with that a lower pH?
"A. It can.
 "Q. Yes, sir. And, of course, you have already testified in your judgment, hypoxia can cause intervertebral hemorrhage; that's true, isn't it?
 "A. Hypoxia can exacerbate other problems that lead to that.
 "Q. If I didn't say intraventricular, I'm sorry, that's what I meant.
 "A. Yes, sir, it can exacerbate other problems that will lead to that.
 "Q. But are you saying that normally you expect prematures to have some bleed in there anyway, would that be true?
"A. Well, many do, normally.
 "Q. Yes, sir. And if you have hypoxia along with that, then that would likely increase that bleeding, right?
"A. That's true.
 "Q. Right. Okay. Thank you. And, Doctor, I believe you know Dr. Huddleston here?
"A. Yes, sir.
"Q. He was one of your instructors?
"A. Yes, sir.
 "Q. And my office I believe has made a claim against you at one time, did they not?
"A. Yes, sir.
 "Q. And this case here has been pending since 1981, around that, 1981, and I believe you were just contacted about it around April 11th of this year?
"A. It was in April. I don't remember the date.
 "Q. That was the first time you knew anything about it?
"A. Yes, sir.
 "Q. And then we took your deposition between that time and the time of trial?
"A. Yes, sir.
 "Q. And it was also agreed in that deposition that you would have, or you told us that you would make no comment about the standard of care that was given at the University Hospital; that's true, is it not? *Page 1261 
 "A. I don't remember saying that. I remember there was some discussion in my deposition between some of the attorneys whether . . . anything at the University was going to be brought up. I really don't know. I can't answer that question.
"Q. And —
 "MR. ALLEN: Well, he hasn't offered any testimony."
This testimony, also, did not touch upon the standard of care practiced at U.A.B.
The issue present under consideration arose when counsel took Dr. Fowlkes upon cross-examination:
 "Q. I didn't think I had any questions because I understood that you had not reviewed the University medical records; is that correct?
 "A. I've looked at the obstetrical records. I have not looked at any of the child's records.
 "Q. Have you studied anything to do with the pH of this child after it was born?
"A. No, sir.
 "Q. Do you wish to be taken by this jury as giving them information at all about this data here?
"A. No, sir, I mean, I'm —
 "Q. I believe that Mr. Emond asked you if after —
 "MR. EMOND: Judge, I'm going to object to that because I wasn't the one that went into it with him. Mr. Allen was the one that went into it with him, not me. It was my understanding he was not going to testify about that.
"THE COURT: Sustained.
". . .
 "MR. NORMAN: You mean they can ask about the chart but I can't?
"[At which time the jury was excused.]
 "MR. NORMAN: Your Honor, I had no idea they were going to go into the chart. They have asked some questions about it, and then Cliff comes back and he says something about the chart and shows this, that or the other thing. And I want to simply conclude it by saying you're not making a representation in what you see about apnea and bradycardia and so forth there could all come from hyaline membrane disease, which I assume he would say uh-huh, and then I would go on to something else.
 "THE COURT: All right, Mr. Emond, what is your objection now? You don't have any objection to that as long as he stops there, right?
"MR. EMOND: I thought he said uh-huh.
"MR. NORMAN: The uh-huh is out?
 "MR. EMOND: If he stops there, but I say, you know —
 "MR. NORMAN: I didn't want to go into it at all.
"MR. EMOND: I didn't either, I —
 "MR. NORMAN: But you did, and I want to at least follow up with that one question.
 "THE COURT: I think he's right. It was Bibb that went into it with him, wasn't it?
 "MR. NORMAN: Sure, but now you're saying —
 "THE COURT: Yes, but you didn't object when Bibb did it.
"MR. NORMAN: What do you mean I didn't object?
 "THE COURT: You did not object when Bibb crossed the borderline over to UH [sic]. And the motions for limine, you know, we have to try these cases on motions for limine like we do on depositions. It's a pageantry, a geometric pageantry, not to try — and part two of the motion says you can't ask Dr. Fowlkes about whether any action of Searcy and Huddleston met the proper standard of care.
 "Now, are you saying that what Bibb asked about pH factors got into that?
 "MR. NORMAN: No, sir. I'm saying I'm absolutely astounded that Bibb asked anything about pH factor.
". . .
 "THE COURT: You don't object as long as he stops where — he's not going to get this man to say they are good doctors, okay?
 "MR. EMOND: If he stops with that question, fine. *Page 1262 
"THE COURT: Okay.
". . .
 "THE COURT: All right, ladies and gentlemen, we will continue with cross-examination.
 "Q. (By Mr. Norman) Doctor, I just had one question about this, since you were asked questions about it. And we have established that you are not attempting to tell the jury anything about these values or what they represent or anything else, right?
"A. Right, yes, sir.
 "Q. But I think that Mr. Emond asked you if this apnea and bradycardia could indicate hypoxia or something or another when he questioned you; do you recall that?
"A. Partially.
 "Q. Partially. I'll ask you if that bradycardia and these other things that are written over here in red are also is [sic] what you would expect to find from hyaline membrane disease.
"A. Yes, sir.
 "Q. All right. I'm through with that. I'm walking away from that, Judge."
Counsel for Drs. Huddleston and Searcy examined Dr. Fowlkes upon another subject, and then counsel for Dr. Ensor took Dr. Fowlkes upon redirect examination and, after obtaining answers pertaining to questions upon other subjects, he asked:
 "Q. Now, I want to talk to you about what they did. You did review that chart, did you not?
"A. The mother's chart at University?
"Q. Yes, sir, up to that time.
"A. Yes, sir.
 "MR. NORMAN: Your Honor, I could go into this if he's going to go into this.
"THE COURT: Sustain the objection.
 "MR. ALLEN: Wait just a minute. I'm talking about from the time the mama got there until the baby was delivered. I'm not talking about after the baby was delivered.
"THE COURT: Sustained again.
 "MR. ALLEN: Well, just for the record, Your Honor does understand that what I want to talk to him about is at the time the baby was put into the hands of Dr. Huddleston until the time it was born.
I want to ask him questions about that.
 "THE COURT: Sustain the objection." (Emphasis added.)
It is clear that Dr. Ensor's counsel wished to examine Dr. Fowlkes about "what they did" at U.A.B. "at the time the baby was put into the hands of Dr. Huddleston." Did this line of questioning offend the restrictions pertaining to the standard of care at U.A.B.? Under the record, this is unclear. For aught that appears, indeed, "what they did" could have included that subject. We cannot determine counsel's purpose because no offer of what he sought to prove was made. When the trial court sustains an objection to a question that does not on its face show the expected answer, a party must make an offer of proof and explain the relevancy of the expected answer to preserve error for appellate review. Bessemer Executive Aviation, Inc. v. Barnett,469 So.2d 1283 (Ala. 1985). Accordingly, we cannot find error in the trial court's ruling.
 IV.
Did the trial court err in allowing plaintiff to call as hostile witnesses three nurses employed by defendant Cullman Medical Center?
During the course of plaintiff's case-in-chief, plaintiff called as witnesses three nurses who were employed at Cullman Medical Center on the night that Mrs. Wilson was treated there. On motion of plaintiff, the trial court declared that they would be considered hostile witnesses under Rule 43(b), A.R.Civ.P. The pertinent part of that rule is:
 "A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness *Page 1263 
thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief. . . ."
Over the objection of the defendants that no hostility had been shown, the trial court, indicating that the test was whether the party (witness) could have been sued, declared that Rule 43(b) would apply to them.
The corresponding federal rule was interpreted inChumbler v. Alabama Power Co., 362 F.2d 161 (5th Cir. 1966), as follows:
 "The distinction between the first sentence of the Rule, which treats of unwilling or hostile witnesses, and the second sentence, dealing with adverse parties and others, was carefully drawn. Under the latter provision, the sole issue is whether the party sought to be called occupies an adverse position to the party seeking to call him. His presumed or actual hostility, or lack thereof, is irrelevant. So also the identity of the named party is irrelevant. The question is whether the party sought to be called could have been sued, either instead of the named defendant or as a co-defendant. If so, and if the witness is an alleged tortfeasor, and if the standard for recovery would be the same whichever were sued, he is an adverse party within the meaning of Rule 43(b). . . ."
To the same effect is 9 C. Wright A. Miller, Federal Practice Procedure, Civil § 2413, at 368-69. Plaintiff's counsel pointed out to the trial court:
 "Your Honor, these are the nurses that participated in the care that we have heard already from Doctor Abramson that they were below the standard of care in their treatment of the patient. And it's their care that under — because of their care that we are suing Cullman Medical Center, as agents of Cullman Medical Center. And we already have the testimony of Doctor Abramson. It was theirs that was below the standard."
Indeed, these nurses were even more than employees of the hospital; they were placed in responsible positions directly related to the provision of the hospital care for which the hospital existed, and, in effect, in the absence of the attending physician, they were the direct supervisors of Mrs. Wilson's care. Cf. Whitworth v. Utilities Board of the Town ofBlountsville, 382 So.2d 557 (Ala. 1980). Under these facts, the trial court could assume that these nurses were hostile witnesses. Thus, we find that the trial judge was correct in his application of Rule 43(b) to this situation.
 V.
Did the trial court err in refusing to grant a new trial for the failure of three members of the jury panel to respond correctly to questions addressed to them on voir dire?
As this Court stated in Alabama Gas Corp. v. AmericanFurniture Galleries, Inc., 439 So.2d 33 (Ala. 1983):
 "The scope of review of this Court on such issues was stated in Martin v. Mansell, 357 So.2d 964 (Ala. 1978), which followed Freeman v. Hall, 286 Ala. 161, 166-67, 238 So.2d 330, 335-36 (1970):
 " 'We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant. . . .'
 "Martin, supra, set out some of the factors to be considered by the trial court when determining whether probable prejudice resulted and by this Court in determining whether an abuse of discretion has occurred, such as: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the venireman's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about. In the perusal and application of these or other pertinent factors from case to case, we note, the question of prejudice is a matter primarily within the trial court's discretion; absent a clear showing of an abuse of that discretion, *Page 1264 
its ruling on the matter will not be reversed. S.S. Kresge Co. v. Ruby, 348 So.2d 484 (Ala. 1977); Norris v. Presley, 292 Ala. 155, 290 So.2d 643
(1974)."
During voir dire, the venire was asked the following question by plaintiff's counsel:
 "[H]ave any of you or anyone in your immediate family ever been either a defendant or a plaintiff in a lawsuit for damages where somebody has brought suit or brought actions for damages, either — where you have been the defendant, the one where the action has been brought against, or the plaintiff, the one where you have brought the action?"
Later, counsel for one of the defendants asked the same question, relating it to personal injury:
 "[H]ave any of you personally filed suit against any person, firm or corporation, claiming damages because of personal injury; that is, claiming damages because you got hurt?
 "Has any immediate member of your family ever had occasion to file suit against any person, firm or corporation claiming money damages because of personal injury; that is, because the family member got hurt?"
In response to the latter questions, a Mrs. Morrison responded, referring to an automobile accident some 23 years before.
Following the trial, an investigation revealed that three of the jurors had been involved in events which called for an affirmative response, but none of them did respond.
Mr. Bennie Conner, Jr., who became foreman of the jury, failed to disclose that in 1979, he and his father sued Willie T. Holmes to recover damages from Holmes, who had backed his car into Conner, Jr.'s automobile. At the hearing on plaintiff's motion for new trial, Conner testified that he had never been involved in any other lawsuit, and that he could not recall this questioning; he said that if he had heard the questions, he did not have the lawsuit on his mind. He had received nothing from it, he did not go to court, and had not hear anything from it. He added that it just did not come to his mind, and that he was not attempting to deceive anyone.
Another venire member, Mrs. Emma Lou Frederick, failed to disclose that her husband, Roy Frederick, had filed a personal injury lawsuit some 23 years before, which arose out of an automobile collision in which her daughter was injured. Mrs. Frederick explained:
 "A. My husband didn't, he didn't apply this. My oldest daughter done this. And Sandy being a minor, my husband had to sign for her.
 "Q. You knew that your husband then had signed the complaint.
 "A. Yes, but this was settled out of court, nobody went to court, it was settled out of court.
"Q. But you remember that this had happened?
 "A. Well, whenever they brought it all up, it come back, you see.
 "Q. And you failed to speak up about it when the —
"A. Well, I just didn't know about it.
 "Q. — questions were being asked of you during the voir dire session?
 "A. I just didn't know about it, I certainly didn't. If I had, I would have certainly let you know.
"MR. BUSHNELL: That's all, Your Honor.
 "Q. (BY MR. WOREL): Mrs. Frederick, when was the first time you even remembered anything about this lawsuit?
 "A. Just when this guy come out there yesterday.
"Q. Came out to your house?
"A. Yes.
 "Q. And at the time that you were here being asked questions did that ever come into your memory?
 "A. No. It never — I thought it was 20 years ago and nothing was ever said or nothing was — you just don't think of those things no more.
 "Q. You never attempted to deceive anybody or not answer a question? *Page 1265 
 "A. Lord, no. And if it would have gotten me off, I would have been glad to have been off, I tell you."
The third juror, Danny L. Wilson, was also examined at the hearing on the defendant's motion for a new trial:
 "Q. Do you recall a question being asked by Mr. Emond whether or not any member of the venire or their immediate family had ever filed a lawsuit for damages?
"A. I have never filed one.
 "Q. Do you recall whether being asked whether or not anyone had ever filed one or had one filed against them?
 "A. The contractor that built my house filed — I mean the lady that furnished the material filed a lawsuit against the contractor.
"Q. Have you been sued before, Mr. Wilson?
"A. Never have.
 "Q. Have you ever been named as a defendant in a lawsuit?
"A. Never have.
 "Q. Mr. Wilson, did a Maddie B. Carter from Dobbs Manufacturing Company file a lawsuit against Danny L. Wilson, that's you and George Wilson living at 600 12th Street in Ensley?
 "A. That's the same one, the contractor was involved in that one, that's what it was.
 "Q. Are you denying that you were a defendant in that lawsuit?
"A. I have never been to Court on nothing.
"Q. Were you sued in that lawsuit?
 "A. That's what he has got. I have never been to Court about it or nothing.
"Q. You never went to Court?
"A. Never went to no Court.
"Q. Do you recall this event happening?
 "A. I recall it happening, but I have never been to Court.
 "Q. What was the reason why you didn't tell us during the venire —
 "A. I hadn't thought about it because that's been 27 years ago.
 "Q. But you admit that you heard the questions being asked about whether or not any member of your family had ever been sued or had sued?
 "A. I heard that, but that had been 27 years ago, that's a long time to remember about something like that not having been to Court about it, you see.
"MR. BUSHNELL: That's all, Your Honor.
"THE COURT: Any questions?
 "Q. (BY MR. WOREL) You didn't remember anything about that suit at the time you were being asked questions?
"A. No, I didn't."
Applying the scope of our review on the issue of the jurors' improper responses, we cannot find any clear abuse of the trial court's discretion in that court's finding that there had been no prejudice to the defendants. Under the evidence, the trial court could have found substantial temporal remoteness of the previous litigation to the present case, inadvertence on the part of these venire persons, or a misunderstanding — at least on their part — of the questions as they related to them personally. Indeed, all appear to have assumed that "filing a lawsuit" meant "going into court." Under the circumstances, we find no error in the trial court's ruling.
 VI.
Did the trial court err in allowing into evidence a publication entitled Standard for Obstetrics and Gynecologists
(5th ed. 1982)?
The defendants contend that this evidence was inadmissible because the publication date, 1982, was three years after the time Dr. Ensor was alleged to have improperly participated in Mrs. Wilson's labor and delivery of Misty. According to defendants, there was no evidence offered that this treatise reflected the standards for obstetricians in 1979.
As this Court stated in Drs. Lane, Bryant, Eubanks Dulaneyv. Otts, 412 So.2d 254, 259 (Ala. 1982):
 "A treatise, essay, or pamphlet on a subject of science which is testified to by *Page 1266 
an expert as being standard and trustworthy on the subject is admissible."
The record reveals compliance with this requirement by Dr. Abramson:
 "Q. Would this book, the 1982 book reflect what the standards were at the time the committee from 1978 through 1981, were developing the standards, would it reflect what the standards were in the medical community in 1979?
". . .
"THE COURT: What's the answer?
"A. The answer is yes, it would.
 "THE COURT: Overrule the objection. The defendant excepts.
"MR. ALLEN: We except.
 "Q. You have seen this book before, have you not?
"A. Of course.
 "Q. And do you consider it standard, authoritative, reliable of the minimum standard or minimum requirements a physician should go by in 1979?
"A. Yes, I do."
The proper predicate having been satisfied, the trial court was not in error in overruling defendants' objection to the admission of this treatise.
 VII.
Did the trial court err in applying the collateral source rule to special education opportunities available to plaintiff as of right?
The issue arose when plaintiff moved in limine to preclude any reference by defendants to the special education and therapy available to Misty Wilson from governmental sources. The trial court granted the motion, and ultimately denied the defendants the opportunity to prove Misty's entitlement under the Alabama Exceptional Child Education Act, Code of 1975, § 16-39-1 et seq., to receive special education and related services, thus reducing her financial need.
Our case of Gribble v. Cox, 349 So.2d 1141, 1142 (Ala. 1977), quoted with approval the general rule found in 22 Am.Jur.2dDamages § 206:
 " '* * * [A]s a general rule, the fact that the plaintiff received gratuitous medical care, continued salary or wage payments, proceeds from insurance policies, or welfare and pension benefits, will not be taken into account in computing damages. * * *'
". . .
 "Defendants say that benefits received from a source wholly independent of the wrongdoer should not be taken into account in computing plaintiff's recoverable damages; such evidence is not relevant, its existence renders neither more probable nor less probable any material fact in the case. They are absolutely correct. . . ." (Emphasis added.)
Defendants here distinguish our rule by insisting that this case falls within a special category, because federal and state laws confer on Misty an absolute right to specialized education and need, unlike cases that deal with insurance proceeds and similar benefits. And so the question presented by that argument is whether the collateral source rule, as applied in Alabama, covers public benefits.
A similar case that dealt with whether state or municipal benefits fall within the rule is Healy v. White, 173 Conn. 438,378 A.2d 540, 546-47 (1977). We quote from that opinion, which disallowed proof of such benefits under the rule:
 "The defendants' sole attack on the question of damages relating to future special education is that the evidence was speculative as to whether the public school program would be discontinued. There was testimony that the cost of special education in private schools ranged from $8,000 to $16,000 annually. Proof that part or all of the cost for such services might not actually be incurred by Brian's father because of benefits provided by a third party independent from the defendants (in this case, the state or municipality) would not be relevant because Connecticut follows the majority rule in this country regarding collateral sources. Thus, the answer to the defendants' argument regarding the uncertainty of the evidence is that proof of whether or not Newtown would continue *Page 1267 
its special education program in its public school system was not relevant under the collateral source rule. See Gorham v. Farmington Motor Inn, Inc., 159 Conn. 576, 579, 271 A.2d 94, 96 [1970], and cases cited. This majority rule 'provides that benefits received by a plaintiff from a source wholly collateral to and independent of the tort-feasor will not diminish the damages otherwise recoverable.' Ibid.; 22 Am.Jur.2d, Damages, § 206, p. 286. This rule has been held to cover free services provided by the state, so long as the source is truly collateral. See, e.g., Thoreson v. Milwaukee Suburban Transport Co., 56 Wis.2d 231, 201 N.W.2d 745, 752 [1972]; see also Aydlett v. Haynes, Alaska, 511 P.2d 1311, 1313
[1973]." (Footnotes omitted.)
Illinois also follows the collateral source rule whereby an amount of damages is not decreased by the amount of benefits received by an injured person from a source independent of the wrongdoer, including medical services provided at government expense, Peterson v. Lou Bachrodt Chevrolet Co.,61 Ill. App.3d 898, 19 Ill.Dec. 117, 378 N.E.2d 618 (1978), or decreased by institutionalization at governmental or charitable expense, Phelan v. Santellis, 30 Ill. App.3d 657,334 N.E.2d 391 (1975). We find no justification under the authorities to depart from that rule in the present case. Thus, the trial court committed no error in applying it here.
 VIII.
Did the trial court err in allowing Dr. Francine Holland to give opinions on Misty Wilson's developmental limitations and medically related needs?
Over objection, the trial court allowed Dr. Holland to express her opinions concerning plaintiff's future development capabilities and need for therapy. Defendants contend that the court violated the expert opinion rule by allowing Dr. Holland to testify concerning medical needs, a subject beyond her qualifications.
Dr. Holland's educational background included a bachelor's degree in speech pathology and audiology, with a minor in psychology; a master's degree in speech pathology, with a minor in psychology; and a Ph.D. in special education. Speech pathology, she explained, is the study of communication and other developmental disorders that impact on communication problems in children and adults. Her doctorate in special education emphasized the multi-handicapped and communication difficulties. In these programs, she studied the educational needs of children with physical and mental disorders. She was experienced in assessment and treatment programs,i.e., testing children in their abilities to use their bodies; how they walked, ran, sat, stood, etc.; testing their minds, how they communicated, how they interacted with other people; and how they were developing. Dr. Holland also studied and worked in the physical and occupational therapy aspect of special education, determining such a child's needs in the way of treatment and the goals to be set for such treatment.
Her pertinent testimony concerning Misty's capabilities and therapy follows:
"Q. And [at] what level would you say she is operating on a behavioral level?
"A. Two and a half to three.
"Q. So in all the different levels that we have been talking [sic], I believe that you are saying she is operating at two and a half to right at three year old level?
"A. Yes, sir.
"Q. And she is six and a half years old?
"A. Yes, sir.
"Q. Simple math says that equates to operating at about half level-wise of what normal is. If she doesn't receive any help whatsoever, no therapy, let's take this as a hypothetical, if Misty is just allowed to just grow up as she is, no therapy, no anything else that could help her besides just medical care to keep her alive so to speak and she grows up. What are we talking about in the future for her as to [what] level she is going to be at as she grows?
"MR. ALLEN: Hold on just a minute. We object to that on the ground that that's *Page 1268 
medical testimony and she is not qualified to say that.
"THE COURT: Overruled. Are you going to add, based on —
"Q. Based on your experience and training and I am not asking you as a medical doctor, I'm asking you in your training that you have had, based on what you know from the statistics and with working with the children, can you tell me your opinion about that?
"A. Okay. Developmentally —
"MR. ALLEN: Excuse me. I have to do this for the record. May I have the —
"THE COURT: Same objection. And same ruling.
"MR. ALLEN: Excuse me.
"A. When we look at children with developmental problems like this, we look at their development as a proportion of their chronological age. Developmentally she is functioning proportional to her age. She is only doing a proportion of what a six year old would do, which you have said is essentially half; that proportion generally continues over time. And with or without intervention, she will continue to make some gains. I can say that because that I have seen her on three separate occasions. The first occasion, I made note of what her skills were and what her developmental levels were. The second occasion there was some change. The change was not extremely significant, it was a matter of a few months in each area and that is without intervention and without therapy. I saw her again yesterday and I see that there is essentially no change since I saw her last June.
"So over time she is going to make some gains without intervention. But over a long period of time, I think that we will be seeing [a] much different type child than we would with one with intervention.
"Q. And when you are saying that she is going to stay at a particular ratio or equation, are you saying that — what happens when you get adult stage, when she is 60, is she going to be operating like a 30 year old? What are you saying there?
"A. No. It will always be that she is functioning at a proportion of her age. But, with time and with age that distance between her functioning level and her actual age tends to increase. There will always be a proportion. And then there comes a time when there is very limited development beyond that point, what we might call a plateau where children will sort of level off and that is about as far as — they have about reached their capacity. It's difficult to say when that occurs but it does occur.
"Q. Can you give us any kind of judgment just so we understand, are we talking teenage years, younger than that, when is this plateau in range-wise?
"MR. NORMAN: I would object to that as not being within her specialty and she is not qualified.
"THE COURT: Overruled.
"A. It's difficult to —
"MR. ALLEN: May we have the same objection.
"THE COURT: Yes, sir, each defendant. Same ruling, overruled. Go ahead.
"A. It's difficult to say when that occurs, it's different with each child. And a lot of that is proportional also to the amount of training that they get during that period of time.
"Q. Well, we are talking about training right now and looking at [a] child without any training, any therapy, anything like that, just in terms of growing up?
"A. Okay.
"Q. Do you have a reasonable expectation of when that plateau would occur?
"A. Reasonably I could say that it happens at least by preteen.
"Q. Preteen means what?
"A. Ten or 12.
"Q. And that would be the time of the plateau?
"A. You begin to see it.
"Q. All right. At that point just so I am on the wavelength, would she at a preteen stage, will she be operating as a preteen?
"A. No, she will not. *Page 1269 
"Q. Okay. So at a preteen, she will still be at the ratio factor that we were talking about?
"A. Yes, we will still see the proportion.
"Q. And that's about a fifty percent proportion is what you are saying.
"And have you in terms of your assessment of Misty, have you made any judgments as to what type of therapy or other related needs she would have in the future because of her condition as you have described?
"A. Yes, sir, I have.
"Q. Would you tell us about that, please.
"A. I would recommend that she receive physical therapy.
"Q. Let's take them one at a time. Physical therapy, what is that?
"A. Physical therapy would be to work on the problems that we have seen in balance, in being able to get stability of her posture and her position in space, to be able to use her body in a more functional way so that she has greater ability to move, to be able to turn and rotate her body in order to change from one position to another and use her body the way, more like a normal pattern.
"Q. For her to reach optimal results, I mean to get to the very best that Misty can get to, how often in your judgment would she need physical therapy if we said we are starting today?
"A. Five times a week.
"Q. Five times a week?
"A. Yes, sir.
"Q. How long would she need it at each instance?
"A. Half hour sessions five times a week.
"Q. All right. And would that ever change as she gets older?
"A. As she gets older, the need would reduce because she would increase things like the posture stability, hopefully she would increase muscle tone and strength of how tight her muscles are and they are working better for her and not held loosely.
"Q. At about what age would you expect that to change?
"A. By probably 18.
"Q. And how often will she need it after she is 18, say the normal life expectancy, how often will she need it at that point?
"A. About three times a week."
Analysis of this testimony, we respectfully observe, discloses that it was well within the professional expertise of Dr. Holland. As stated in Independent Life Accident Ins.Co. v. Aaron, 282 Ala. 685, 213 So.2d 847 (1968):
 "Whether a witness possesses the requisite qualifications to be an expert is a primary question largely within the discretion of the trial court. King v. State, 266 Ala. 232(5), 95 So.2d 816 [1957].
 "The courts of this state have long held that to qualify as an expert witness, it must appear that by study, practice, experience, or observation, as to a particular subject matter, the witness has acquired a knowledge beyond that of ordinary witnesses. Hicks v. State, 247 Ala. 439, 25 So.2d 139 [1946]; Thomas v. State, 249 Ala. 358, 31 So.2d 71 [1947]."
The evaluation and assessment of plaintiff's physical and occupational therapy requirements were within the ken of Dr. Holland's knowledge and beyond that of an ordinary witness, and thus the trial court was not in error by permitting her testimony.
 IX.
Did the trial court err in submitting to the jury loss of earning capacity as an element of damages?
In determining this and related issues, it is necessary to look to Dr. Holland's testimony concerning plaintiff's cognitive faculties:
 "Q. . . . You talked yesterday about the plateau. My recollection is that you said without any training at all, no therapy, no anything, just leaving this child alone, that she would obtain a level of about 12 years of age? *Page 1270 
 "A. I said she would plateau at about 12, 10 to 12 years of age, chronological age.
". . .
 "Q. I was talking about a plateau. You said with training she would achieve a better plateau. But you didn't tell these folks what that plateau would be?
"A. It's difficult to predict exactly.
". . .
 "A. With all the training she would be able to do, as I described, live in a sheltered environment, work in a sheltered environment.
". . .
 "A. Yesterday, I was not giving an age level at which she would [be] functioning. I was giving a time in her chronological age at which we would being to see her skills plateau. I said without training she would plateau at the age of 10 to 12; with all of the training by the time she is 18 or greater we will begin to see a plateau in her skills. I was not giving an age level. It's difficult to predict an age level. I can say that at the rate that she is progressing now, that we will continue to see this proportion of her . . . age, but I cannot predict an exact age level.
 "Q. You mean, with or without therapy she is never going to get beyond a fifty percent level, is that what you are telling these folks?
 "A. Proportion now is fifty percent. The proportion is generally reduced when there is additional training and adequate training with a child.
 "Q. Yes, ma'am. Let's get back to the plateau. With all of this training when will she plateau, please, ma'am?
 "A. Generally we will see it come around 18 to 21.
"Q. But she would plateau without it at 12?
"A. Ten to 12.
 "Q. Eighteen to 21. At eighteen to 21 when she will plateau, do you mean that she will then have gone as far as she will ever go?
 "A. No, I do not. I mean that in terms of acquisition of new skills she will generally plateau at that time.
 "Q. What does plateau mean? Does it mean that it ends, it stops there, it levels there or what does it mean?
 "A. Plateau, it slows down, there is no acquisition of additional new skills but maybe enrichment of the old ones.
 "Q. I see. And at the peak of her achievements where would you expect her age level to be, please, ma'am?
". . .
 "A. It's not common practice in my profession for us to put age levels on the future because that's what we call predicting something that we may then only work to that level. If we predict, for example, that a child would reach the age of ten, we might get into a self-fulfilling prophesy of saying because she will only achieve to age ten, we will only train her with skills up to a ten year old and then we will quit. And that's not the attitude that we take in my field. We take the attitude that we will continue to train until we see the plateau and then at the time we see the plateau we will continue to enrich at that level. But we don't try to predict plateaus before they occur.
". . .
 "A. . . . I cannot tell you with the training that she won't go past 15. I can't tell you that she won't go past ten. I know she will make gains, the research has shown that children do make gains with this type of training. It also shows that they do plateau without this type of training.
 "Q. While you are throwing numbers out, you can't predict she won't go to 20?
"A. No, I cannot.
"Q. Can't predict she won't go to 25?
"A. I can predict she won't go that far."
Additionally, Dr. Holland testified:
 "Q. Please, ma'am, Doctor Blair has expressed an opinion that this little child could grow up to be self-supporting. Would that disagree with your testimony and your conclusions here? *Page 1271 
 "A. The definition of self-supporting would have to be laid out. In terms of self-supporting like you and I are self-supporting, I would disagree. There are degrees of self-support. And I would anticipate that in this child's future that she may be able to work in a sheltered environment, one in which there was supervision, live in a sheltered environment in which there was supervision.
 "But in terms of being self-supporting like you and I, I would have to disagree.
 "Q. You mean by that, that she can't be a communication expert or a lawyer, is that what you are talking about?
 "A. I am saying that she would have to always have some degree of supervision in a living situation, some degree of supervision in a work situation. A work situation which would be as we have in the communities for handicapped folks.
 "Q. No way that she could get by without supervision to do any job in the world that you can think of that would make her self-supporting?
 "A. She will enter the work force as a handicapped individual and will be given wages that are different from the normal work force."
Dave Saurman, Ph.D., an economist at Auburn University, was qualified as an expert in the projection of medical costs and future earnings by an individual. After testifying to normal life expectancy, normal work life expectancy, and the principle of discounted present value of future earnings, tables, and calculations, Dr. Saurman explained in detail how he arrived at Misty's normal work life expectancy.
Dr. Saurman also explained the mathematical analysis utilized in determining what a female in 1999 with a high school education would earn upon entering the work force, based upon published federal government data, and summarized from the extensive data on which he based his projections:
 "Q. Doctor Saurman, just summarizing, this sheet that is marked Plaintiff's Exhibit 62, it's got Misty Wilson's future costs and lost earnings. You were saying with a four-year high school education loss earnings if we put it in the bank or put it in the CD's — the [sic]?
"A. The three month Treasury Bills.
 "Q. You said a guardian could put away $544,031.71 to provide for that 42.1 years and have nothing left over at the end?
"A. Yes.
 "Q. That's 'A' and 'B,' both scenarios. On the first scenario, I asked you to assume that she had an income health aide until age 37 or when her mother reached age 65, and then a live-in homemaker from that point on through life expectancy. And you said the cost for the home health aide until her mother reached age 65 would be $481,330.22?
"A. Yes.
 "Q. That's the costs that she would have right now if you wanted to provide that?
 "A. That's what you would have to invest today, yes.
 "Q. And after that, the live-in homemaker, it would be $789,021.33?
"A. Yes.
 "Q. Okay. And adding those both together would give you from point of time now through her life expectancy care?
"A. Yes.
 "Q. All right. And then as an alternative, 'B,' I have alternative, just having a live-in homemaker from right now to life expectancy. You said you would need to put away $1,420,122.58 today to be able to provide for that for her life?
"A. That's correct.
 "Q. All right. And then for the therapies, the occupational, physical and speech therapies, the cost to be put away at this point to provide for her life was $202,210.23?
"A. $202,210.23.
 "Q. And that provides for all of the therapies — that only provides up to age 18?
"A. That's correct.
 "Q. Okay. We need to put in one other right there, from age 18 through her life. Okay. And that's the $585,045.65? *Page 1272 
"A. Yes.
 "Q. Okay. I am going to say until age 18, and then to life expectancy. All right. We have to add those two together.
 "And then your therapeutic and ambulation equipment, you would have to put away $3,285.29?
"A. Yes.
 "Q. And by adding up the first one, column 'A,' if you had the lost earnings, had the guardian paying that out through her natural work life expectancy, plus the costs of the home health aide or live-in homemaker, plus the costs of therapies, to put away money now for that, plus the cost of therapeutic and ambulation equipment, the figure comes to $2,604,924.63. Is that correct?
"A. That's correct.
 "Q. And Doctor Saurman, does that mean that if we put away that much money and provided for those needs that at the end of her life expectancy there would be no money left?
"A. That's correct.
 "Q. And then on the other side for column 'B' was the lost earnings, plus what she had a home live-in for her whole life, plus the therapeutic and ambulation equipment, total of $2,754,695.66?
"A. Yes.
 "Q. And would that provide her to have that money through her natural work life expectancy and have a home health live-in and have the therapy that she needs, the therapeutic equipment she needs and that at the end of her normal life expectancy have nothing left over?
"A. Yes.
 "Q. All right. And on this we forgot to put in the therapy, that $3,285.49?
"A. Yes.
 "Q. All right. And again on this, this would provide minimum wage earnings if a guardian put the money away today that would be able to provide a minimum wage for her natural work life expectancy and at the end of that time have nothing left?
"A. That's right.
"Q. That's $224,418.31?
"A. Yes.
 "Q. And again we would have those two figures, the home health care from the other board; is that correct?
"A. Yes.
 "Q. The same figures for the therapy, and this is until age 18 and through life expectancy, $202,210, $585,045. And adding those together plus the therapeutic costs of the equipment that we have talked about, to have it three times during her life, the total figure would be $2,285,311.23?
"A. That's right.
 "Q. And that would provide for all of these services, plus provide the guardian as a paymaster and having nothing left over at the end of the life expectancy?
"A. That's right.
 "Q. And then on the other side, we have got the lost earnings, plus the live-in homemaker, plus the therapy, plus the equipment, coming down to $2,435,082.26?
"A. Yes."
These and other projections presented by Dr. Saurman, some omitted here, were based upon calculations supported by economic and financial data that afforded a basis for estimating future costs, expenses, and lost earnings.
The trial court charged the jury on loss of earning capacity as follows:
 "In arriving at the amount of your award for any loss of earning capacity, you should consider what the plaintiff's health, physical ability and earning power or capacity would have been had she not been injured, the nature and extent of her injuries and whether or not they are reasonably certain to be permanent or if not permanent the extent of their duration, all to the end of determining, first, the effect, if any, of her injuries upon her earnings. And second the present cash value of any loss of earning capacity which you are reasonably satisfied by the evidence in the case that the plaintiff is reasonably certain to suffer in *Page 1273 
the future as a proximate or direct result of the injury in question."
Defendants' principal argument on this issue is that the evidence was insufficient to support the submission of the question of the amount of lost earnings to the jury. In that connection, this Court's decision in Carnival Cruise Lines v.Snoddy, 457 So.2d 379, 381 (Ala. 1984), is applicable:
 "In a personal injury action, a plaintiff is entitled to recover both the value of the work time lost prior to trial ('lost earnings') and the value of the reduction in his ability to earn a living ('impairment of earning capacity'). D. Corley and C. Gamble, Alabama Law of Damages § 36-4 (1982); see, also, 22 Am.Jur.2d Damages § 90 (1965). In order, however, for a jury to make a determination as to the compensation due an injured plaintiff for a reduction in his ability to work, there must be evidence introduced at trial from which the jury may reasonably draw an inference as to the existence of an impaired capacity to earn, resulting from the injuries complained of. That is to say, there must be evidence from which the factfinder may reasonably translate the evidence of plaintiff's physical disability into a finding of plaintiff's inability to perform his work in the same manner as before sustaining his injuries.
 "It is this element of individual variation that precludes the universal inferences of diminished earning capacity merely from evidence of physical disability, and nothing more. A jury, left to flounder without some evidence of a causal connection between the physical impairment and the reduced earning capacity, and without an evidentiary predicate upon which to assess the actual degree of impairment in earning capacity, engages in pure speculation and conjecture. Unlike an assessment of damages for pain and suffering or mental anguish, the correlation of physical disability with impaired earning capacity cannot be said, in every case, to fall within the purview of the average person's common understanding and experience. Except in extreme and obvious cases, some direct evidence of the existence and extent of impaired earning capacity is necessary as the foundation upon which the jury may make an informed assessment of damages."
(Citations omitted.) (Emphasis added.)
It is clear that the evidence of Misty Wilson's permanent brain damage, of her cognitive plateau, of her highest earnings at minimum wage, and of her ability to work in a sheltered environment at one-half the minimum wage, was directed to proving her loss of earning capacity. It is equally clear that Dr. Saurman's extensive analysis of the terms of actual earnings which could be reasonably expected, did not leave the jury to "flounder" in a sea of "pure speculation and conjecture." There was direct evidence of her disabilities and evidence that related those disabilities to her impaired earning capacity. We cannot in this case conclude that the trial court erred in submitting that subject to the jury.
We must observe, moreover, that the verdict of the jury was a general verdict, and the evidence of medically-related special damages equated the $2.5 million verdict. Indeed, in overruling defendant's motion for a remittitur, the trial court observed:
 "This was a case of a badly brain damaged young child whose witnesses testified to some $2,500,000 (see plaintiff's exhibit # 63) in special damages. The defendants thoroughly cross-examined plaintiff's witnesses whose testimony supported these expenses and obviously the jury believed these witnesses. The high figure of $2,500,000 is directly related to these high special damages."
Thus, this Court cannot determine whether the jury assessed any damages for loss of earning capacity or lost earnings.
We must add that the trial court was not in error in submitting to the jury the subject of future medical treatment and related care expenses as items of damages. It is well established in this jurisdiction that future medical expenses are a proper element of damages in personal injury actions. Elba Wood Products, Inc. v. Brackin, *Page 1274 356 So.2d 119 (Ala. 1978). The charge was clearly supported by the testimony.
Finally, we note that the trial court denied defendants' motion for a remittitur:
 "3. In accordance with Hammond v. City of Gadsden, [493 So.2d 1374 (Ala. 1986)], undersigned states for the record certain factors considered in not granting remittitur, or new trial:
 "A. Alabama law is that a remittitur or a new trial should not be ordered on the grounds of excessiveness of the jury's verdict except where the court can see that the verdict is tainted by bias, passion, prejudice, corruption, or other improper motive. Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963); Airheart v. Green, 267 Ala. 689, 104 So.2d 687 (1958). In short, a remittitur or a new trial should be ordered on the ground of excessiveness where there is an improperly functioning jury.
 "B. Undersigned Judge tried this case from May 5, 1986 through May 23, 1986 and closely observed the jury and each member thereof, and all and each of the parties involved, and all and each of the attorneys in the case, and the court is satisfied and convinced the verdict was not tainted, nor the result of bias, nor prejudice. There was neither claim for, nor suggestion of, punitive damages in the case. This was a case of a badly brain damaged young child whose witnesses testified to some $2,500,000 (see plaintiff's exhibit # 63) in special damages. The defendants thoroughly cross-examined plaintiff's witnesses whose testimony supported these expenses and obviously the jury believed these witnesses. The high figure of $2,500,000 is directly related to these high special damages. Had the specials been $225 with verdict of $250; or had the specials been $2225 and verdict of $2500; or had the specials been $22,250 and verdict of $25,000; or, had the specials been $225,000 and verdict of $250,000, the plaintiff in each case would probably file motion for new trial on the ground of inadequate award. In the court's view, when the arithmetic progression is extended to specials of $2,250,000 and verdict of $2,500,000, defendants cannot argue the verdict is shocking.
 "C. In his final argument to the jury, the attorney for these defendants spoke on damages and his remarks from R-2747 show clearly the defendants knew then the high verdict potential:
 " 'The reason I argue damages at all, the reason I argue damages at all is I don't know what you are going to do. I think I ought to win the case. But if I don't win it, again, I am frank enough to say I want the verdict to be reasonable.
 " 'The law puts that in your hands. The law puts that in your hands to believe what you want to believe about it. What is the truth about how bad the child is hurt. What is the truth about the need for all these things. That's all for you. How long will the child live. That's all for you because you are human beings. But I do know this, ladies and gentlemen, if you put four hundred thousand dollars in a savings account at six percent, that's two thousand dollars a month every month of the year and you have still got the four hundred thousand dollars and as long as you keep the four hundred thousand dollars, you get two thousand dollars a month forever and ever.' " (Emphasis added.)
 Our independent examination of the record supports the conclusion of the trial court in the denial of the remittitur.
Let the judgment be affirmed.
AFFIRMED.
MADDOX, JONES and ADAMS, JJ., concur.
HOUSTON, J., concurs and concurs specially as to issue V.
SHORES, J., concurs in the result.
[1] Section 6-5-484(a):
 "In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community."